[Cite as *State v. Oswald*, 2018-Ohio-245.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No.    28633 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| FRANK OSWALD | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No.    CR-2016-04-1302 |

DECISION AND JOURNAL ENTRY

Dated: January 24, 2018

---

CALLAHAN, Judge.

{¶1}   Defendant-Appellant, Frank Oswald, appeals from his conviction in the Summit County Court of Common Pleas.  This Court affirms.

I.

{¶2}   One Saturday evening, Mr. Oswald and his cousin attended a wedding reception for a member of their family.  Mr. Oswald's cousin came with his girlfriend, the victim in this matter, and she socialized with Mr. Oswald as the evening progressed.  When the reception ended, Mr. Oswald, the victim, and her boyfriend (Mr. Oswald's cousin) drove together to a nearby hotel where several family members had rented rooms for the evening.  They then spent the next few hours visiting with other cousins, drinking, and occasionally smoking marijuana.

{¶3}   Eventually, all of the cousins returned to their own rooms, save for Mr. Oswald, who needed a place to sleep.  The victim's boyfriend agreed that Mr. Oswald could stay in their room, but a fight between the victim and her boyfriend led to her and Mr. Oswald being alone

together in the room. According to the victim, she and Mr. Oswald fell asleep in the hotel bed, fully dressed and with only their hands touching. She then awoke some time later to find him having vaginal intercourse with her. The victim immediately told Mr. Oswald to stop, and he complied. Several days later, she spoke with the police about the incident, and they arrested Mr. Oswald.

{¶4} A grand jury indicted Mr. Oswald on one count of rape and two counts of sexual battery. The first sexual battery count alleged a violation of R.C. 2907.03(A)(2) while the second count alleged a violation of R.C. 2907.03(A)(3). Following a bench trial, the court found Mr. Oswald guilty of the latter sexual battery count and not guilty of his remaining counts. The court sentenced him to serve two years in prison and classified him as a tier III sexual offender.

{¶5} Mr. Oswald now appeals from his conviction and raises three assignments of error for this Court's review.

II.

**ASSIGNMENT OF ERROR NO. 1**

THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION UNDER R.C. § 2907.03(A)(3) IN VIOLATION OF [MR.] OSWALD'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY ARTICLE I, SECTION 10 OF THE OHIO STATE CONSTITUTION AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

{¶6} In his first assignment of error, Mr. Oswald argues that his sexual battery conviction is based on insufficient evidence. Specifically, he argues that there was no evidence he knew the victim was asleep when he began having vaginal intercourse with her. This Court disagrees.

{¶7} Whether the evidence in a case is legally sufficient to sustain a conviction is a question of law that this Court reviews de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy." *Thompkins* at 386. Although the standard of review is de novo, the appellate court does not resolve evidentiary conflicts or assess the credibility of witnesses, because these functions belong to the trier of fact. *State v. Tucker*, 9th Dist. Medina No. 14CA0047-M, 2015-Ohio-3810, ¶ 7.

{¶8} "No person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender knows that the other person submits because the other person is unaware that the act is being committed." R.C. 2907.03(A)(3).

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

R.C. 2901.22(B). Whoever commits the foregoing offense is guilty of sexual battery. R.C. 2907.03(B).

{¶9} The victim testified that she resided in Columbus when these events transpired, but drove north for the weekend to attend a wedding with her boyfriend, who was Mr. Oswald's

cousin. The victim had met Mr. Oswald once or twice before at family gatherings and sat at a table with him during the reception. After the reception, the victim, her boyfriend, and Mr. Oswald drove together to a nearby hotel where several members of the boyfriend's family had reserved rooms for the evening. The victim testified that she had consumed alcohol during the wedding and, on the drive to the hotel, took an Adderall to help her stay awake longer. Additionally, she gave Mr. Oswald an Adderall.

{¶10} Once at the hotel, the victim changed into a t-shirt, sweatshirt, and a pair of leggings. She and her boyfriend had reserved their own room that evening, but joined his cousins in another room after changing clothes. Over the next few hours, the victim, her boyfriend, and his cousins continued to drink and went outside a few times to smoke marijuana. Eventually, the victim and her boyfriend returned to their room along with Mr. Oswald and another cousin. The cousin departed not long after, leaving Mr. Oswald with the couple. The victim testified that her boyfriend then agreed to let Mr. Oswald sleep on the floor in their room because he needed a place to stay. There was testimony that, at that point, it was about 4:00 a.m.

{¶11} Not long after Mr. Oswald lay down on the floor to sleep, the victim and her boyfriend began arguing. The victim indicated that their argument was more intense than usual because they were both intoxicated. The fight roused Mr. Oswald and also resulted in the boyfriend leaving the hotel without the victim. Greatly upset, the victim sobbed and talked to Mr. Oswald about her relationship with her boyfriend. She then went into the bathroom and took a Xanax before lying down in bed. The victim testified that she and Mr. Oswald ultimately fell asleep in the same bed, fully clothed, with only their hands touching.

{¶12} At some later point, the victim awoke and felt Mr. Oswald pressing against her from behind. Though she was confused, she quickly registered that her leggings and underwear

had been pulled down and Mr. Oswald was having vaginal intercourse with her. She then said: "I didn't give you permission to do this." According to the victim, Mr. Oswald stopped slowly and acted "really casual," as if he had not done anything wrong. She testified, however, that she never invited Mr. Oswald to have sex with her, never signaled that it was acceptable for him to do so, and never assisted him in pulling down her clothing.

{¶13} Although the victim made several attempts to contact her boyfriend, she was unsuccessful. She testified that she could not otherwise arrange a ride back to her car, so she had to accept a ride from Mr. Oswald. Once she got back to her car, she returned to Columbus without telling anyone what had happened. The victim described being confused, embarrassed, and unsure of what to do.

{¶14} Later that evening, the victim sent a text message to her boyfriend, indicating that she was extremely upset because she had "woke[n] up to [Mr. Oswald] having sex with [her]." Her boyfriend then called and, after they spoke, she agreed that he could report the incident to the police. Meanwhile, that same evening, the victim received a text message from Mr. Oswald, asking if she was doing alright. The victim did not initially respond to Mr. Oswald's message, but her boyfriend sent Mr. Oswald a text message, asking him, "How could you do that?" In response, Mr. Oswald indicated that he was "freaking out," described himself as having suicidal thoughts, and wrote: "Please tell her I am so sorry and tell her once I realized what I was doing I stopped[.]"

{¶15} Over the course of the next two days, the victim went to the hospital for an exam and returned to the Twinsburg area to meet with Detective Brian Donato. While speaking with the detective, the victim responded to Mr. Oswald's text message. The following text message exchange then took place:

[THE VICTIM]: I mean I trusted you in the room with me [] and I woke up to you having sex with me. I didn't give you permission. Or even lead you on. You were comforting me and told me everything was going to be ok with me and [my boyfriend].

[MR. OSWALD]: I know[.] And this is killing me[.] [I've] never done anything like this before and I am disgusted with what happened[.] Once you said that I realized what I was doing and * * * stopped[.]

When the victim wrote, "You hurt me by raping me in my sleep," Mr. Oswald responded by asking if he could call her. He also repeatedly apologized and wrote that it "was never [his] intention to hurt [her] * * *."

{¶16} Detective Donato and another officer met with Mr. Oswald at his home the day after the victim's interview. The detective surreptitiously recorded the meeting, and the State played portions of the recording at trial. Mr. Oswald informed the officers that he and the victim fell asleep together, but he then awoke, pulled her pants down, and "forced [himself] on her * * *." Mr. Oswald stated that the victim was making noises, so he thought "maybe" she was awake. When asked whether the victim had been "passed out when [he] started," however, Mr. Oswald responded, "yeah, * * * we were definitely both asleep." He also acknowledged that, while he was having sex with the victim, she attempted to turn and said, "I didn't give you permission to do this."

{¶17} Viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded that, at the time he had sex with the victim, Mr. Oswald knew she was submitting because she was unaware of what was happening. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus; R.C. 2907.03(A)(3). The victim specifically testified that she fell asleep next to Mr. Oswald fully clothed, but awoke to find her leggings and underwear pulled down and Mr. Oswald having sex with her. *See Summit v. Anderson*, 9th Dist. Summit No. 27886, 2016-Ohio-7275, ¶ 19. She testified that she never invited him to engage in intercourse

with her or helped him pull down her clothing. Indeed, both she and Mr. Oswald agreed that, as he was having sex with her, she stated: "I didn't give you permission to do this."

{¶18} When text messaging with the victim, Mr. Oswald never attempted to deny forcing himself on her. In fact, when confronted with her message, "I woke up to you having sex with me * * *," Mr. Oswald responded: "I know[.] And this is killing me[.]" He also admitted to Detective Donato that he pulled down the victim's leggings, that she was "passed out" when he began, and that he "forced [himself]" on her. *See State v. Smetana*, 9th Dist. Lorain No. 12CA010252, 2013-Ohio-2376, ¶ 14. Although Mr. Oswald remarked at one point that he thought "maybe" the victim was awake, he made no attempt to verify that fact. A rational trier of fact, therefore, could have concluded that he believed there was a high probability that the victim was asleep or otherwise unconscious, but failed to inquire or acted "with a conscious purpose to avoid learning the fact." R.C. 2901.22(B). As such, this Court rejects his argument that his sexual battery conviction is based on insufficient evidence. Mr. Oswald's first assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 2

[MR.] OSWALD'S CONVICTION IS AGAINST THE MANIFEST WEIGHT
OF THE EVIDENCE.

{¶19} In his second assignment of error, Mr. Oswald argues that his conviction is against the manifest weight of the evidence. This Court disagrees.

{¶20} When a defendant argues that his conviction is against the weight of the evidence, this court must review all of the evidence before the trial court.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way

and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins*, 78 Ohio St.3d at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

{¶21} At trial, Mr. Oswald testified in his own defense. Consistent with the victim's testimony, he described how a night of drinking and smoking marijuana led to him falling asleep on the floor of the victim's hotel room. Much like the victim, he testified that he awoke when the victim and her boyfriend began fighting and the boyfriend left the hotel. At that point, the victim was crying and invited Mr. Oswald to sit on the bed with her. He indicated that they spoke for some time before nodding off. It was his testimony that they fell asleep "holding hands and in the spooning position."

{¶22} According to Mr. Oswald, he woke up because the victim "was pressing her butt against [his] penis" and was making "moaning noises." Though neither of them spoke and he could not see the victim's face, he testified that the victim continued to move against him for approximately thirty seconds before he began to pull down her leggings and underwear. Mr. Oswald testified that the victim's leggings were "skin tight," but she assisted his efforts by "wiggl[ing] her body to help [him] pull them down." As the victim continued to move her body against Mr. Oswald, he pulled down her underwear and began having vaginal intercourse with her. Mr. Oswald testified that, based on the victim's movements and the noises she was making,

he believed she was awake and inviting him to have sex with her. He estimated that he had sex with the victim for approximately ten seconds before she told him to stop and he complied.

{¶23} Mr. Oswald indicated that he repeatedly expressed remorse for his actions, not because he forced himself on the victim, but because he disrespected her relationship with his cousin by having sex with her. He testified that, before he drove the victim back to her car that morning, she said everything was fine and simply requested that he not tell her boyfriend what had happened. According to Mr. Oswald, the victim acted normally during their entire car ride, talking and laughing with him. He testified that, until he received her text messages a few days later, he believed that the two had engaged in consensual sex. He indicated that he was nervous when he spoke to the police and that some of his statements had been taken out of context. According to Mr. Oswald, when he said he forced himself on the victim, he only meant that he used some force to remove her clothing and "[m]athematically" used some force to put his penis inside her.

{¶24} Mr. Oswald argues that his conviction is against the manifest weight of the evidence because the evidence tended to show that he and the victim engaged in consensual sex that the victim later regretted. He notes that the victim's leggings were skin tight, such that he could not have removed them without her assistance. He further notes that the victim's actions were inconsistent with a sexual battery given that she remained with him after they had sex, later asked him to drive her home, and never sought assistance from any of the other wedding guests whom she knew to be staying in the same hotel. According to Mr. Oswald, his first indication that the victim did not wish to have sex came when she told him to stop and he immediately complied. He asserts that, at the time the sexual activity was occurring, he did not know that the victim was asleep or otherwise unconscious.

{¶25} Having carefully reviewed the entire record, this Court cannot conclude that the trier of fact lost its way when it found Mr. Oswald guilty of sexual battery. The victim clearly testified that she was not awake when Mr. Oswald began having sex with her. Although Mr. Oswald claimed that she suggestively moved against him and helped him pull down her leggings, he made no mention of her alleged movements or assistance when speaking with the police. Instead, he acknowledged to the officers that he awoke, pulled down her leggings, and "forced [himself] on her * * *." He also conceded that the victim was "passed out when [he] started." Mr. Oswald made no attempt to deny the victim's accusations when she sent him text messages, alleging that he had sex with her in her sleep and raped her. Though the victim accepted a ride from Mr. Oswald that morning and kept quiet about the incident until much later that evening, she explained that she did so because she was confused, embarrassed, and unable to secure another ride to her car. Faced with two competing versions of the events, the trial court was "in the best position to determine the credibility of witnesses and evaluate their testimony accordingly." *State v. Johnson*, 9th Dist. Summit No. 25161, 2010-Ohio-3296, ¶ 15. "A verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's witnesses rather than the defendant's version of the events." *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. Because Mr. Oswald has not shown that this is the exceptional case where the evidence weighs heavily against his conviction, this Court rejects his manifest weight argument. His second assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 3

THE TRIAL COURT IMPROPERLY PERMITTED TESTIMONY REGARDING [MR.] OSWALD'S ALLEGED STATEMENT TO DETECTIVE DONATO, THEREBY DEPRIVING HIM OF HIS RIGHTS UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.

{¶26} In his third assignment of error, Mr. Oswald argues that the trial court erred when it allowed the State to question him about certain, unrecorded statements he allegedly made to Detective Donato. For the following reasons, this Court rejects his argument.

{¶27} The decision to admit or exclude evidence lies in the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). "Absent an issue of law, this Court, therefore, reviews the trial court's decision regarding evidentiary matters under an abuse of discretion standard of review." *State v. Aguirre*, 9th Dist. Lorain No. 13CA010418, 2015-Ohio-922, ¶ 6. An abuse of discretion indicates that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶28} When cross-examining Mr. Oswald, the prosecutor asked him about statements he allegedly made to Detective Donato while in transit to the police station. The following exchange took place:

[PROSECUTOR]: [D]uring those questions with the detectives in the car ride, * * * you admit that you have viewed pornography -- you tell them "I've viewed pornography involving incest and sex with sleeping people"; right?

[MR. OSWALD]: That's not true.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled. Go ahead.

[MR. OSWALD]: That's not true.

[PROSECUTOR]: And you also stated to the police officers that you've done searches on the internet related to sleeping porn and porn involving family?

[MR. OSWALD]: That's not true, either.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[PROSECUTOR]: Okay. So, what the detectives wrote in there is something they made up?

[DEFENSE COUNSEL]: Objection. It's not in evidence.

[PROSECUTOR]: I'm asking if he believes that they just made that up, that they're lying.

[MR. OSWALD]: They were --

THE COURT: Wait, wait, wait. The report is not in evidence.

[PROSECUTOR]: Correct.

THE COURT: Right. So, if -- okay, so you're denying * * * that you said that?

[MR. OSWALD]: Correct.

Defense counsel then once again objected on the basis that the prosecutor never asked Detective Donato about the statements during his direct examination, and the detective's report was inadmissible.

{¶29} Mr. Oswald argues that the unrecorded statements contained in Detective Donato's report were highly inflammatory because they implied "some sort of deviant sexual and/or pornographic interest [that] would undoubtedly prejudice [the] trier of fact * * *." He argues that the court erred when it allowed the State to question him about the statements because the report was not in evidence, and he never had the opportunity to cross-examine the detective about the alleged statements.

{¶30} Even assuming that the trial court erred by allowing the State to ask Mr. Oswald about the statements contained in Detective Donato's report, this Court cannot conclude that the foregoing exchange affected his substantial rights. *See* Crim.R. 52(A) (errors that do not affect substantial rights "shall be disregarded"). First, the State introduced other evidence that was at least partially corroborative of the unrecorded statements contained in the report. During its case-in-chief, the State played a recording of Mr. Oswald at the police station having a telephone conversation with his mother. While on the phone, Mr. Oswald told his mother how he and the

police discussed the victim having been asleep when he had sex with her and the possibility that this "could be a fetish or something." Mr. Oswald then stated: "they were saying, like, when did this start, and I was thinking like, it's kinda like…this is kinda true, like I might have a problem." Accordingly, quite apart from his exchange with the prosecutor, the trial court heard Mr. Oswald acknowledge the possibility that he harbored an interest in having sex with a sleeping individual. Mr. Oswald has made no attempt to explain how the State's line of questioning prejudiced him in light of his statements on the recording. *See* App.R. 16(A)(7).

**{¶31}** Second, because this was a bench trial, this Court presumes that the trial court considered "only the relevant, material, and competent evidence in arriving at a decision." *State v. Diaz*, 9th Dist. Lorain No. 02CA008069, 2003-Ohio-1132, ¶ 39. Regardless of whether Mr. Oswald ever viewed certain types of pornography, the issue before the trial court was whether, when he engaged in sexual conduct with the victim, he knew that she was submitting because she was unaware it was occurring. *See* R.C. 2907.03(A)(3). To that end, the court heard a significant amount of circumstantial evidence tending to show that Mr. Oswald did, in fact, know that the victim was either asleep or otherwise unconscious. Notably, in orally announcing the guilty verdict, the court set forth the evidence upon which it relied and never referenced Mr. Oswald's unrecorded statements. Mr. Oswald has not shown that, but for the State's line of questioning about the unrecorded statements, the court would not have convicted him. *See* Crim.R. 52(A). Accordingly, his third assignment of error is overruled.

III.

**{¶32}** Mr. Oswald's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

LYNNE S. CALLAHAN
FOR THE COURT

HENSAL, P. J.
TEODOSIO, J.
CONCUR.

APPEARANCES:

ERIC C. NEMECEK, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.