[Cite as *State v. McCary*, 2019-Ohio-4596.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO                                    :
                                                 :
    Plaintiff-Appellee                    :      Appellate Case No. 28250
                                                 :
v.                                               :      Trial Court Case No. 2018-CR-2078
                                                 :
RICHARD McCARY IV                                :      (Criminal Appeal from
                                                 :       Common Pleas Court)
    Defendant-Appellant                   :
                                                 :

. . . . . . . . . . .

O P I N I O N

Rendered on the 8th day of November, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Atty. Reg. No. 0095826, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

CARL BRYAN, Atty. Reg. No. 0086838, 120 West Second Street, Suite 603, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} After a jury found Richard McCary IV guilty of one third-degree felony count of sexual battery in violation of R.C. 2907.03(A)(3), the trial court sentenced him to 36 months in prison. McCary appeals from that judgment of conviction. The judgment of the trial court will be affirmed.

## Factual and Procedural Background

{¶ 2} In 2018, G.F., a 23-year-old woman, was living at the St. Vincent de Paul women's shelter in downtown Dayton. Late in the morning of May 28, 2018, she and Michelle, another woman from the shelter, took a bus to the House of Bread, which served free meals. There they met up with Michelle's boyfriend and another man named "Rich" (McCary), whom G.F. had not met previously. A few hours later, after eating lunch, G.F. wanted to go to the Dayton Mall, but was unfamiliar with bus routes to the mall, so "Rich" agreed to accompany her.

{¶ 3} G.F. and McCary spent a few hours together at the mall. As evening arrived, G.F. realized that her cell phone was dead. Not knowing the time or the correct bus route to take, and fearing that she would not be able to get back to the shelter before the 7 p.m. curfew there,[1] G.F. asked McCary if she "could stay at his place for the night." (Tr., p. 236.) According to G.F., she "felt like [she] really didn't have any other option." (Id., p. 237.) McCary assented. While they waited for a bus, G.F. asked McCary to stop "constantly touching [her]," which made her "uncomfortable"; she told him she had a

---

[1] G.F. explained that women living at the shelter were supposed to call if they would be late, but she could not do so because her phone was dead (Tr., pp. 292-293), and "if you're not there by 7, then they're not going to let you in." (Id., p. 294.)

boyfriend. The two then rode a bus to the hub near where McCary lived and walked to his building from there.[2]

{¶ 4} G.F. signed the visitor's log in the lobby of McCary's building. The two rode an elevator up to McCary's apartment, where McCary gave her some food and water, and G.F. took a shower. After showering, G.F. re-dressed in the same dress she had been wearing before, but did not put her soiled underwear back on.[3] She then returned to the living room.

{¶ 5} Because the apartment had no furniture,[4] G.F. and McCary sat on the living room floor while he showed her how to play a video game. G.F. plugged her phone in to charge, then lay on the floor with headphones on to sleep, while McCary continued to sit on the floor playing the game. According to G.F., at about 1 a.m., she heard McCary say her name, and she awoke to find her legs "wide open." When she asked McCary what he was doing, he told her that he was "eating me out," which she understood to mean oral sex. (Tr., p. 259.) He also said that he had been unable to "put his dick in me." (*Id.*) G.F. said she was "mad" and told McCary "he did that without my consent." (*Id.*) G.F. described McCary trying to "hug" her from behind following her reaction, which led her to tell him not to touch her. She "grabbed [her] stuff" and "just walked out of the building," where she immediately placed a 911 call to report that she had been sexually assaulted. (*Id.*, pp.

---

[2] A video recording played at trial depicted G.F. and McCary boarding the bus near the mall, sitting together during the trip back downtown, and leaving the bus together when it arrived at the downtown hub at about 6:31 p.m. (State's Exh. 6.)

[3] G.F. testified that she did not have "an extra pair" of underwear with her, and "honestly, it's kind of disgusting to have to put dirty underwear back on." (Tr., p. 302.)

[4] The record suggests that McCary only recently had moved into the apartment and had not yet acquired furniture. (Tr., p. 298.)

260-261.)[5]

{¶ 6} Outside McCary's building, G.F. encountered a woman who asked if G.F. was okay and pointed out a bruise[6] on her (G.F.'s) neck. According to G.F., the bruise had not been there earlier, and she had no memory of receiving it. The unknown woman explained G.F.'s situation to a man who volunteered to wait with her until the police arrived. While they were waiting, McCary came outside, but G.F. refused to talk to him and he eventually left. When a police officer arrived, G.F. described what had happened. At her request, she was transported to the hospital, where her neck, vaginal area, and the inside of her mouth were swabbed for a sexual assault kit.

{¶ 7} Later, G.F. was interviewed by Detective Zachary Williams at the Dayton police department. She described "Rich" and gave his apartment number to Det. Williams. G.F. identified McCary from a photo array. She also identified him in the courtroom at trial, where she testified as recounted above.

{¶ 8} Officer Devin C. Portis of the Dayton Police Department was the first witness presented at McCary's trial. Officer Portis testified that while on patrol at about 2 a.m. on May 29, 2018, he was "flagged down" by a man outside a downtown Dayton apartment complex. That man told Officer Portis that a young woman wanted to speak to him about something that had happened; Officer Portis checked his patrol car's computer and confirmed that a 911 call reporting a sexual assault had been made from that location at

---

[5] The parties stipulated to the accuracy of an audio recording of G.F.'s 911 call. (State's Exh. 1.) Although G.F. reported that she had been "raped," the jury was instructed to disregard that characterization, as McCary was not charged with rape.

[6] Elsewhere, G.F. described that "bruise" as "a hickey" formed by "sucking on someone's neck." (Tr., pp. 269.)

about 1 a.m. Portis spoke to G.F., whom he described as "pretty calm." He said she was transported to the hospital.

{¶ 9} Teara Shuck testified as the sexual assault nurse examiner who performed G.F.'s sexual assault examination. Shuck identified the sexual assault exam kit she collected on May 29, 2018, and the swabs and other evidence it contained. She said that G.F. reported sleeping at the home of "Rich," a man she met at House of Bread, and awaking to the man performing oral sex on her and saying he had been unable to penetrate her with his penis. Shuck noted that G.F. had a bruise on the left side of her neck. Shuck's physical examination also revealed some redness and a tear "consistent with a point of contact injury"[7] in G.F.'s genital area. On cross-examination, Shuck confirmed that she could not determine whether her exam findings were the result of consensual or non-consensual acts.

{¶ 10} The State presented Mary Barger, a forensic scientist in the DNA and serology section of the Miami Valley Regional Crime Laboratory, as an expert witness regarding the test results from G.F.'s sexual assault kit. Barger testified that semen was not detected on any of the swabs from G.F.'s body, but DNA in the samples collected from G.F.'s neck and inner labia matched McCary. She agreed that the presence of DNA is not indicative of consent or the lack of it.

{¶ 11} Officer Wayne Hammock of the Dayton police testified that on May 30, 2018, he and his partner were at a downtown apartment complex on another call when two detectives asked them to assist in locating a suspect (McCary). Officer Hammock

---

[7] According to Shuck, "something forcibly contacted that area to cause that tear." (Tr., p. 215.)

identified a video recorded while McCary was being transported in the backseat of his (Hammock's) cruiser. Officer Hammock described McCary as "a little upset that he was being accused of a crime," but otherwise "pretty calm." He said that McCary consented to a search of his apartment.

{¶ 12} The State's final witness was Detective Zachary Williams. Det. Williams testified about his investigation of G.F.'s assault complaint, including his separate interviews of G.F. and McCary. He described G.F. as "very fact-of-the-matter" as well as consistent from her initial statements through her trial testimony. Det. Williams stated that he was familiar with the St. Vincent de Paul shelter and its policy that female residents are "denied access" if they are not on site by 7 p.m. After G.F. provided a description of her assailant and the location and number of his apartment, the manager of that apartment complex advised Det. Williams that McCary was the tenant in that apartment.

{¶ 13} With the assistance of other officers, Det. Williams obtained video surveillance footage from the apartment building that showed McCary with G.F. on the evening of May 28 and the morning of May 29, 2018. On the sign-in sheet at McCary's apartment building, Det. Williams found G.F.'s name signed in as a visitor to McCary's apartment number. Upon locating McCary in the building on May 30, Det. Williams obtained McCary's permission to search his apartment and arranged for McCary to be transported to police headquarters.

{¶ 14} Det. Williams said his search of McCary's apartment confirmed that, as G.F described, it contained little or no furniture and few personal items. A recording of Det. Williams's interview with McCary was played for the jury. During that interview, McCary confirmed many of the details of G.F.'s account, including meeting G.F. at the House of

Bread, taking the bus and spending the afternoon together at the Dayton Mall, and allowing G.F. to shower and spend the night in his apartment. McCary stated that he "put a hickey on" G.F.'s neck and "was trying to get with" her while he "thought she was asleep." He admitted that he "went down"[8] on G.F. "to show her some affection." McCary said G.F. still did not wake up, which made him stop and look at her and think "she was acting asleep." McCary said he then told G.F. to turn over, and she "woke up." When he told her what he had done, G.F. accused him of raping her. He denied penetrating or ejaculating in G.F. According to Det. Williams, McCary admitted that he touched G.F.'s vaginal area with his fingers and could have caused the tear found there during her sexual assault examination.

{¶ 15} McCary consented to a DNA swap from inside his cheek. He said that during the day, G.F. had been wearing a relatively short reddish dress, glasses, a bra, a thong, and shoes. However, he said G.F. was not wearing the thong when she came out of the shower. McCary said that G.F. had told him she had a boyfriend who was engaged to someone else. She also asked him if he was "trying to get with her," and he said that he was. Beyond that, however, McCary said they did not talk much.

{¶ 16} On cross-examination, Det. Williams stated that G.F. never told him she felt afraid of McCary. However, Det. Williams said he never asked G.F. whether she feared McCary. Williams agreed that McCary had been compliant and cooperative with police officers, including by consenting to a search of his apartment and a swab of his cheek for a DNA sample. Det. Williams also said that McCary once or twice claimed to have

---

[8] Det. Williams explained, without objection, his understanding that "went down" meant that McCary performed oral sex on G.F.

believed that G.F. might be "faking" being asleep, but only after he said multiple times that she *was* asleep when he began performing oral sex. Despite McCary's claim during the interview that G.F. had been "all up on" him, Det. Williams said footage (which the jury viewed) from the pair's bus ride and arrival at McCary's building showed a "quite opposite" situation; in Det. Williams's view, G.F. appeared to be "quite distant" as to McCary.

{¶ 17} After moving for the admission of exhibits, the State rested. The trial court denied defense counsel's motion for acquittal pursuant to Crim.R. 29(A).

{¶ 18} McCary testified in his own defense. He said that he walked from his apartment to the House of Bread on the morning of May 28, 2018, arriving at about 10 a.m. There he saw his friend Carl, who was with Carl's girlfriend and G.F. McCary introduced himself to G.F., and the four sat together, conversing and eating lunch, until about 11:30 or noon. McCary said he found G.F. attractive and asked if he "could hang with her for the day." (Tr., p. 445.) The group took a bus to the downtown hub, where Carl and his girlfriend (G.F.'s friend Michelle) went their own way. G.F. asked McCary what bus to take to go to the Dayton Mall, and he accompanied her to the bus stop. According to McCary, at this point, G.F.

> * * * started playing around. She started playing. Told me had [sic] a thong
> on. I had a shocked face. Then she's telling me she's got to – she's telling
> me excuse me, I've got to pull my thong out, as I turned my head and we,
> you know, we kind of laughed at that.

(*Id.*, p. 447.)

{¶ 19} McCary said that while they rode the bus to the mall together, G.F. had

earbuds in her ears, and the two did not talk. Once at the mall, however, they went to a series of stores together, "just cracking jokes and laughing." (*Id.*, p. 449.) According to McCary, while they were at Guitar Center, G.F. was listening to music through her earbuds and "got sad and her eyes got teary." (*Id.*, p. 450.) McCary testified that he "h[e]ld her in [his] arms, trying to comfort her." (*Id.)* He said he "had no idea" why she was crying, but she assured him that he hadn't done anything wrong. McCary said he hugged G.F. for "[f]ive, ten minutes," and she did not try to move away or push or slap his hands away. Next, they walked back to the bus stop, where they sat on a bench and talked about G.F.'s housing situation. McCary said he put his arm "like behind" G.F. while trying to encourage her by telling her about his own transition from a shelter to his own place. They boarded the bus when it arrived at about 6 p.m.

{¶ 20} McCary testified that while riding the bus back downtown, G.F. "was still sad and teary eyed," so he tried to comfort her by putting his arm around her and rubbing her back and her thigh.[9] He said G.F. never moved away or objected. When they arrived at the bus hub, he invited her to stay at his place. Once there, he prepared some food and they discussed G.F.'s relationship status; "she told me she had a boyfriend who was engaged with a fiancé. So I * * * asked her * * * [w]hy don't you just get with me? * * * And then she said no, she loved him or something like that." (Tr., p. 456.)

{¶ 21} McCary said he offered to let G.F. use his shower, and she did. G.F. emerged after her shower in the same dress and sat on the floor, where McCary let her play a video game. He testified that G.F. told him "you can look, you can touch me," so

---

[9] McCary said he also pulled down the hem of G.F.'s dress because the dress had ridden up and "you know, she's supposed to be [a] lady * * *." (Tr., p. 453.)

he lifted her dress and saw that she was not wearing underwear. According to McCary, G.F. told him to move closer, then to lie on his back next to her. After "it seems like a minute or two," McCary lifted G.F.'s dress and began to perform oral sex. He said he thought she was awake because "I don't see how you can go to sleep that fast." Although G.F.'s eyes were closed, she turned her head when he "put a hickey on her neck," and "her legs are in the air, spread apart." McCary said he performed oral sex a second time, and "masturbat[ed] her with my hand." Thinking she was "acting asleep," McCary "test[ed]" her by telling her to turn over. At that point, G.F. opened her eyes and sat up. When McCary told her he had performed oral sex on her, G.F. accused him of raping her and left the apartment. McCary testified that he went outside to try to convince G.F. to return, but went back to his apartment alone when she refused to speak to him.

{¶ 22} McCary then described police officers coming to his apartment and transporting him to police headquarters. He testified that he "told the detectives that same truth" about the signs that G.F. actually was awake but pretending to be asleep.

{¶ 23} On cross-examination, McCary claimed that after his interview with detectives shown at trial, "they also brought me back into the room and that wasn't recorded." (Tr., p. 487.) He confirmed many of the details of G.F.'s testimony through the bus ride back downtown, but said that she did not ask to stay at his apartment; rather, he invited her there. He said that the events that followed in the apartment happened at around 8 p.m. to 10 p.m., at the latest. Reviewing the video of G.F.'s leaving the building, however, he acknowledged that her departure occurred at 1:17 a.m., so "I must have forgot the time."

{¶ 24} McCary also claimed to have told the detectives information that did not

appear in the interview recording – e.g., that G.F. gave him permission to touch her, that she turned her head, that her legs were "in the air," and that he believed she could not have fallen asleep so quickly. He again claimed that detectives took him back for "an extra interrogation" that they did not record, and that those statements occurred during that unrecorded interview. He admitted, however, that he did tell the detectives that he initially "thought she [G.F.] was asleep."

{¶ 25} On rebuttal, the State presented additional testimony from Det. Williams as well as testimony from Det. Sara Von Holle, who was present during McCary's interview. Both denied that any unrecorded second interview occurred.

{¶ 26} Following closing arguments, the jury returned a verdict of guilty on the single count of sexual battery. The trial court ordered a presentence investigation and later entered a judgment of conviction sentencing McCary to 36 months of imprisonment. McCary appeals from that judgment, raising these assignments of error:

1) Mr. McCary's conviction for sexual battery was against the manifest weight of the evidence.

2) The trial court committed reversible error when it charged the jury with the instruction that "Ignorance of the law is not a defense, meaning that knowledge that certain conduct is unlawful is not a necessary element when action is done knowingly is an element of an offense."

**Assignment of Error #1 – Manifest Weight of the Evidence**

{¶ 27} McCary's first assignment of error alleges that his conviction was against the manifest weight of the evidence. His argument attacks the credibility of G.F.'s claim to have been unaware that McCary was performing oral sex on her, contending that the

evidence showed G.F. "actually facilitat[ed] the sexual contact." (Brief of Appellant, p. 5.)

{¶ 28} "[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 29} In reviewing challenges based on the manifest weight of the evidence, we are required to consider all of the evidence admitted at trial, regardless of whether it was admitted erroneously. *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 26; *State v. Rosales*, 2d Dist. Montgomery No. 27117, 2018-Ohio-197, ¶ 16, citing *State v. Johnson*, 2015-Ohio-5491, 55 N.E.3d 648, ¶ 95 (2d Dist.). Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).

{¶ 30} The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the

evidence only in exceptional circumstances. *Martin* at 175.

{¶ 31} The statute under which McCary was convicted provides in pertinent part as follows:

(A) No person shall engage in sexual conduct with another, not the spouse

of the offender, when any of the following apply:

* * *

(3) The offender knows that the other person submits because the other

person is unaware that the act is being committed.

R.C. 2907.03(A)(3). "Sexual conduct" as used therein includes cunnilingus. R.C. 2907.01(A). "A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶ 32} The Ninth District Court of Appeals has observed that the focus of R.C. 2907.03(A)(3) is not on the victim's subjective state of mind, but rather "on what *'[t]he offender knows'* concerning the victim's submission" due to unawareness. (Emphasis sic.) *State v. Antoline*, 9th Dist. Lorain No. 02CA008100, 2003-Ohio-1130, ¶ 52. "[I]n many prosecutions under R.C. 2907.03(A)(3), * * * the offender's knowledge that the victim submits because of his or her unawareness is inferred from the victim's testimony that, initially, he or she was subjectively in a state of unawareness (e.g., sleep or unconsciousness), during which the offender initiated and engaged in sexual conduct." (Citations omitted.) *Id.* at ¶ 55; *accord State v. Shaffer*, 4th Dist. Hocking No. 18CA5, 2018-Ohio-4976, ¶ 21, quoting *Antoline* at ¶ 51-52. G.F.'s testimony that she was asleep when McCary performed oral sex on her supports such an inference.

{¶ 33} McCary's testimony that he believed G.F. was only pretending to be asleep

does not mean that the jury verdict was against the manifest weight of the evidence. Although McCary deems it implausible that G.F. "somehow slept through receiving oral sex and a hickey on her neck" (Brief of Appellant, p. 5), the jury was permitted to credit her testimony. G.F. explained that she is "a heavy sleeper[;] it's kind of sometimes hard to wake me up." (Tr., p. 303.) "A jury can reasonably conclude that the defendant knew the victim was * * * unable to object to the defendant's conduct if there was evidence that the victim was in a state of deep sleep * * *." *State v. Anderson*, 6th Dist. Wood No. WD-04-035, 2005-Ohio-534, ¶ 41, citing *State v. Branch*, 10th Dist. Franklin No. 00AP-1219, 2001 WL 548630, *2 (May 24, 2001). As noted by the appellate court in a case factually similar to this one, "[a] verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's witnesses rather than the defendant's version of the events." *State v. Oswald*, 9th Dist. Summit No. 28633, 2018-Ohio-245, ¶ 25, quoting *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. Accord *State v. Brown*, 2d Dist. Montgomery No. 27738, 2018-Ohio-3068, ¶ 35 (testimonial inconsistencies "do not render a defendant's conviction against the manifest weight of the evidence"). The jury that heard McCary's case cannot be said to have lost its way by choosing to accept G.F.'s version of events.

{¶ 34} Furthermore, during his interview with Det. Williams, McCary himself admitted that he "was trying to get with" G.F. while he "thought she was asleep." Although later in that interview he said that at some point he concluded that G.F. "was acting asleep," McCary's own statements would support an inference that McCary had reason to know that G.F. likely was asleep when he first began to perform oral sex on her. This is not the exceptional circumstance in which the record indicates that the jury's resolution

of conflicts in the evidence created a manifest miscarriage of justice.

**{¶ 35}** McCary's first assignment of error is overruled.

**Assignment of Error #2 – Erroneous Jury Instruction**

**{¶ 36}** In his second assignment of error, McCary contends that the trial court erred by instructing the jury that ignorance of the law was not a valid defense to the sexual battery charge against him. McCary argues that the instruction to that effect deprived him of the ability to pursue a defense based upon a mistake of fact – i.e., his mistaken impression that G.F. was not asleep or was only pretending to be asleep at the time of the sexual conduct.

**{¶ 37}** "A criminal defendant has the right to expect that the trial court will give complete jury instructions on all issues raised by the evidence." *State v. Williford,* 49 Ohio St.3d 247, 251, 551 N.E.2d 1279 (1990); *State v. Mullins,* 2d Dist. Montgomery No. 22301, 2008-Ohio-2892, ¶ 9. As a corollary, a court should not give an instruction unless it is specifically applicable to the facts in the case. *State v. Fritz,* 163 Ohio App.3d 276, 2005-Ohio-4736, 837 N.E.2d 823 ¶ 19 (2d Dist.). The decision to give a requested jury instruction is a matter left to the sound discretion of the trial court, and the court's decision will not be disturbed on appeal absent an abuse of discretion. *State v. Elliott,* 2d Dist. Montgomery No. 26104, 2014-Ohio-4958, ¶ 22.

**{¶ 38}** When reviewing a trial court's jury instructions, an appellate court must consider the instructions as a whole rather than viewing an instruction in isolation, and then determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights. *State v. Crawford,* 2d Dist. Montgomery No. 22314, 2008-Ohio-4008, ¶ 36, citing *Becker v. Lake Cty. Mem. Hosp.*

*West,* 53 Ohio St.3d 202, 560 N.E.2d 165 (1990). An appellate court will not reverse a conviction due to an erroneous jury instruction unless the error was so prejudicial that it might have induced an erroneous verdict. *Id.*; *see also Hayward v. Summa Health Sys./Akron City Hosp.,* 139 Ohio St.3d 238, 2014-Ohio-1913, 11 N.E.3d 243.

**{¶ 39}** The particular jury instruction to which McCary now objects stated as follows:

> Ignorance of the law is not a defense, meaning that knowledge that certain conduct is unlawful is not a necessary element when action is done knowingly is an element of an offense.

(Sic.) (Tr., p. 599.)[10]

**{¶ 40}** " '[T]he general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system.' " *State v. Wheatley,* 2018-Ohio-464, 94 N.E.3d 578, 36 ¶ (4th Dist.), quoting *Cheek v. United States,* 498 U.S. 192, 199, 111 S.Ct. 604, 112 L.E.2d 617 (1991). That principle applies when a person "knowingly" commits a prohibited act, even if he is unaware the act is prohibited. *See State v. Jones,* 8th Dist. Cuyahoga No. 90903, 2009-Ohio-3371, ¶ 5 (affirming conviction of having weapon under disability despite defendant's alleged ignorance that prior drug conviction created disability).

**{¶ 41}** McCary does not contend that the instruction given misstates the law. Rather, he in essence argues that the instruction about ignorance of the *law* was

---

[10] Although the charge conference regarding the jury instructions does not appear in the record before us, it apparently is undisputed that McCary's trial attorney preserved an objection to that instruction. (*See* Brief of Appellant, p. 6.) We have no indication that McCary requested or that the trial court declined to give a separate instruction regarding the effect of mistakes of fact.

erroneous because it "confused the jury" as to the viability of his defense based upon an alleged mistake of *fact*. (Brief of Appellant, p. 7.) We do not accept that premise.

**{¶ 42}** "Generally, mistake of fact is a defense if it negates a mental state required to establish an element of a crime * * *." *State v. Arnold*, 2013-Ohio-5336, 2 N.E.3d 1009 (2d Dist.). The trial court permitted the instruction regarding "ignorance of the law" because McCary's police interview suggested that McCary believed he did not commit a sex offense if no penetration occurred, and such professed belief is not consistent with R.C. 2907.03(A)(3). However, the "ignorance of the law" instruction did not preclude McCary from arguing that he lacked the requisite mens rea to commit sexual battery because he believed, however mistakenly, that G.F. was awake when he began to perform oral sex on her. Indeed, McCary's trial attorney presented that very defense to the jury in his closing, arguing:

> [E]ven if you find that [G.F.] was unaware of the acts being performed on her that night, you cannot find that Rich McCary knew she was unaware. Rich told you from the witness stand, he thought she was playing. She initiated the contact. She leaned over. She put her legs in the air. Even if you believe that [G.F.] was asleep that evening, common sense and reason of any skeptical person would think those are the actions of someone who is awake. You don't have any evidence before you to suggest otherwise.

(Tr., p. 583.)

**{¶ 43}** Furthermore, the State's rebuttal argument during closing reinforced the viability of a defense based on a mistake of fact as to whether G.F. was asleep. The assistant prosecutor stated: "This comes down to[,] did he [McCary] know? Was he aware

that when he's performing oral sex on her that she is unaware that it's happening? That's your only question * * *." (*Id.*, p. 585.) Later, the State also clarified the limited applicability of the "ignorance of the law" instruction, arguing: "It does not matter if he [McCary] did not know that this was illegal conduct. What matters is does he know he's operating when she is unaware and unable to speak about what happens to her body." (*Id.*, p. 595.)

{¶ 44} Nothing in the record suggests that McCary was found guilty because the "ignorance of the law" instruction misled jurors into thinking that McCary would not have a valid defense if he mistakenly believed that G.F. was not actually asleep. To the contrary, based on the record, it appears far more likely that the jury did not find McCary to be credible. McCary's trial testimony not only conflicted with G.F.'s trial testimony and her earlier reports to the police and the sexual assault nurse examiner, but also conflicted with his own initial account to the police, where he indicated that he "thought [G.F.] was asleep." Furthermore, McCary's testimony that he provided exculpatory statements in a second interview that the police failed to record may have eroded his credibility further in the eyes of jury, especially given rebuttal testimony from police officers denying that any such second interview occurred.

{¶ 45} The record provides no basis to conclude either that the instruction given by the trial court was erroneous or that any error in that instruction (although we find none) was so prejudicial that it might have induced an erroneous verdict. McCary's second assignment of error is overruled.

## Conclusion

{¶ 46} The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and TUCKER, J., concur.


Copies sent to:

Mathias H. Heck
Michael P. Allen
Carl Bryan
Hon. Michael W. Krumholtz