[Cite as *State v. Maxwell*, 2026-Ohio-1961.]

IN THE OHIO COURT OF APPEALS
FIFTH APPELLATE DISTRICT
STARK COUNTY, OHIO

| | |
|---|---|
| STATE OF OHIO | Case No. 2025CA00124 |
| Plaintiff - Appellee | <u>Opinion and Judgment Entry</u> |
| -vs- | Appeal from the Stark County Court of Common Pleas, Case No. 2025-CR-0379 |
| ROBERT MAXWELL | Judgment: Affirmed |
| Defendant - Appellant | Date of Judgment Entry: May 26, 2026 |

**BEFORE:** Andrew J. King; William B. Hoffman; Robert G. Montgomery, Judges

**APPEARANCES:** Kyle L. Stone, Stark County Prosecuting Attorney, Kameisha J. Johnson, Assistant Prosecuting Attorney, for Plaintiff-Appellee; D. Coleman Bond, for Defendant-Appellant.

*Hoffman, J.*

**{¶1}** Defendant-appellant Robert Maxwell appeals his convictions and sentence entered by the Stark County Court of Common Pleas, on one count of sexual battery, one count of strangulation, and one count of domestic violence, following a bench trial. Plaintiff-appellee is the State of Ohio. We affirm the trial court.

STATEMENT OF THE CASE AND FACTS

{¶2} On April 11, 2025, the Stark County Grand Jury indicted Appellant on one count of sexual battery, in violation of R.C. 2907.03(A)(3)(B), a felony of the third degree (Count 1); one count of sexual battery, in violation of R.C. 2907.03(A)(1), a felony of the third degree (Count 2); one count of strangulation, in violation of R.C. 2903.18(B)(2)(C)(2), a felony of the third degree (Count 3); and one count of domestic violence, in violation of R.C. 2919.25(A)(D)(2), a misdemeanor of the first degree (Count 4). Appellant appeared before the trial court for arraignment on April 18, 2025, and entered a plea of not guilty to the Indictment.

{¶3} At the final pretrial on June 16, 2025, Appellant acknowledged on the record he was waiving his right to a jury trial and electing to proceed with a bench trial. Appellant was presented with a negotiated plea offer of 3 years in prison with consideration for an early judicial release. Appellant declined the offer.

{¶4} The matter proceeded to bench trial on June 17, 2025. The following evidence was presented at trial.

{¶5} The Victim and Appellant met online in June or July, 2024. The Victim sold her home and moved in with Appellant in October, 2024. The two married on January 28, 2025. The Victim and Appellant are both veterans. Each suffer from post-traumatic stress syndrome and each sustained a traumatic brain injury during his/her time in military service. The Victim and Appellant are both 100% V.A. (Veterans Administration) disabled. In addition, the Victim has bone spurs on her neck, which run down her spine.

{¶6} On the morning of February 19, 2025, Appellant and the Victim slept in. The Victim was not feeling well and was taking antibiotics. When Appellant woke up, he went about "his usual routine where he was smoking pot" and the two were "just hanging

out at the house." Trial Transcript, p. 16. Appellant had a chiropractor appointment in the afternoon and, when he returned home, he "was just grumpy 'cause he was in pain from the chiropractor appointment." *Id.* at p. 17.

{¶7} Appellant and the Victim decided to go to a Mexican restaurant for dinner. On the way to the restaurant, Appellant stopped at a liquor store and purchased a pint of liquor and a large bottle of vodka. Appellant told the Victim alcohol was "the only thing that would help his back pain." *Id.* at p. 17. The Victim hesitated because "in the past liquor didn't agree with him." *Id.* The Victim did not consume any alcohol because of the antibiotics she was taking.

{¶8} Appellant was mad at the Victim because she did not "order off the dollar menu" and he was "getting irritated because [the Victim] didn't follow his rules." *Id.* at p. 18. Appellant yelled at the Victim the entire way home. Once they arrived home, Appellant "began to drink and drink." *Id.* Appellant poured a "big thing of whiskey and for hours and hours he did nothing but berate [the Victim] and get more and more drunk to the point where it escalated and he started really getting violent, verbally violent." *Id.*

{¶9} The Victim "had had enough" and told Appellant she was going to bed. The Victim placed her retainer in her mouth and took her prescription sleeping pill, which "knocks [her] out." *Id.* at p. 19. The Victim had just started to fall asleep, when she was awoken by the bed moving. The Victim found Appellant leaning over her, forcing his penis into her mouth. Appellant repeatedly pushed down on the Victim, "like balancing his body on [her] neck." *Id.* The Victim struggled to breathe. Appellant got off the bed and made another drink, "like nothing had happened." *Id.* at p. 20.

{¶10} The Victim was angry and shocked by what had occurred and was afraid to go back to sleep. She attempted to confront Appellant, but her words were garbled

because of the shock of the incident and the effects of the sleeping pill. Appellant continued to berate and abuse her. The Victim was unable to keep her eyes open and told Appellant she was going to bed.

{¶11} While she was sleeping, the Victim felt pain in her anus and realized Appellant had his penis inside her. The Victim demanded Appellant get off her because "[i]t was very painful" due to her having hemorrhoids. *Id*. at p. 23. Appellant was not completely erect and did not ejaculate. Appellant left the bedroom and went to make another drink. The Victim went to the bathroom to clean up. When she exited the bathroom, Appellant was standing in the hallway in front of the bedroom door. Appellant would not let the Victim get past him to return to the bedroom. Appellant grabbed the Victim by the neck, holding her with both of his hands, and pushed her into the wall. The Victim fell. She was "so scared" as she thought Appellant was going to kill her. *Id*. at p. 25. Appellant went to the kitchen to make another drink. The Victim went into the bedroom and dialed 9-1-1.

{¶12} Stark County Sheriff's Deputy Wyatt Halstead was on routine road patrol, working the midnight shift from 11 p.m. on February 19, 2025, to 7 a.m. on February 20, 2025. At approximately 5 a.m., he was dispatched to Appellant's residence in response to a domestic violence complaint. When Deputy Halstead arrived, the Victim met him at the front door and invited him inside. The Victim informed the deputy Appellant was intoxicated and had been drinking all night. Appellant commented the Victim had attacked him.

{¶13} Deputy Halstead and the Victim went into the master bedroom to speak privately. The Victim, who was visibly upset and crying, detailed the events of the evening. Thereafter, Deputy Halstead asked Appellant to step outside and the two had a

brief conversation. The deputy advised Appellant he was under arrest. Appellant was handcuffed and searched, then led to the cruiser.

{¶14} Stark County Sheriff's Deputy Tiffany Adkins arrived at the scene as Deputy Halstead was placing Appellant in his cruiser. The two deputies proceeded inside the residence to speak with the Victim. Deputy Halstead described the Victim as "very distracted," which made it difficult to obtain a complete statement. Paramedics from the Plain Township Fire Department were called to the scene after the Victim reported she had been strangled. Paramedics took the Victim's vitals. The Victim declined paramedics offer to transport her to the hospital, but presented the next day.

{¶15} After Deputy Halstead left to transport Appellant to jail, Deputy Adkins took the Victim's full statement. The Victim disclosed Appellant attempted to force her to perform oral sex on him and subsequently anally penetrated her. The Victim also reported Appellant had grabbed her by the throat and slammed her against a wall.

{¶16} Later in the morning, the Victim attended a previously scheduled appointment at the V.A. Hospital. After the Victim "broke down," she told the nurses what had happened. The nurses urged the Victim to go to the hospital. Later that day, the Victim presented to the emergency department of Aultman Hospital with complaints of strangulation, domestic violence, and sexual assault. She was seen by Sarah Schaffer, a SANE ("Sexual Assault Nurse Examiner") nurse. The Victim provided Nurse Schaffer with a narrative history, which corroborated what she had told the deputies. The Victim was experiencing pain in her head and shoulder area. She rated the level of pain to her anterior neck as a 7 or 8 on a scale of 10. The Victim also complained of rectal pain. Nurse Schaffer confirmed the Victim's injuries were consistent with the narrative she provided.

**{¶17}** Based upon the history the Victim provided to Nurse Schaffer, scans of her neck were ordered. The scans did not reveal any internal injuries. However, the medical records indicated the Victim experienced pain upon touching her clavicle joint area with redness to the skin and noted "right sternoclavicular fracture suspected." *Id.* at p. 148. Medical personnel informed the Victim they were unable to determine whether there was a fracture due to the inflammation from her spurs. Nurse Schaffer collected a sexual assault kit. The nurse did not observe any noticeable trauma during the rectal exam, however, she explained the lack of trauma was not inconsistent with forcible anal rape.

**{¶18}** Appellant testified on his own behalf. He claimed the Victim initiated the sexual encounter. Appellant explained he was in a lot of pain following his chiropractic appointment and was unable to become aroused. He apologized to the Victim, rolled her out from under him, and left the bedroom. The Victim followed him into the living room and asked him what was wrong. Appellant denied attempting to have sexual relations with the Victim later that evening. The Victim came out of the bedroom around 4:00 a.m., sat on his lap, and started to kiss him. Appellant told the Victim to go back to bed. Appellant was sitting in his recliner when the Victim called 9-1-1.

**{¶19}** After hearing all the evidence, the trial court found Appellant guilty of sexual battery as set forth in Count 1, but not guilty of sexual battery as set forth in Count 2. The trial court also found Appellant guilty of Count 3, strangulation, and Count 4, domestic violence. The trial court scheduled a sentencing hearing for June 23, 2025.

**{¶20}** Appellant appeared before the trial court for sentencing on June 23, 2025. After affording the State, Appellant, and the Victim an opportunity to speak, the trial court ordered a pre-sentence investigation and rescheduled the sentencing hearing.

{¶21} At the sentencing hearing on August 4, 2025, the trial court imposed a prison term of 36 months on Count 1, sexual battery, 12 months on Count 3, strangulation, and 30 days on Count 4, domestic violence. The trial court ordered the sentences imposed on Counts 3 and 4 be served concurrently to the sentence imposed on Count 1. The trial court indicated it would consider a motion for judicial release after Appellant served 4 months. The trial court classified Appellant as a Tier III sexual offender.

{¶22} It is from his convictions and sentence Appellant appeals, raising the following assignments of error:

I. THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION AGAINST APPELLANT, AND THE CONVICTION MUST BE REVERSED.

II. THE APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED, AND MUST BE REVERSED.

I, II

{¶23} In his first and second assignments of error, Appellant challenges his conviction for sexual battery and strangulation as based upon insufficient evidence and as against the weight of the evidence.

*Standard of Review*

{¶24} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, paragraph two of the syllabus (1997). Sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, while

weight of the evidence addresses the evidence's effect of inducing belief. *Id.* at 386-387. A finding a conviction is supported by the manifest weight of the evidence, however, necessarily includes a finding the conviction is supported by sufficient evidence and will therefore be dispositive of the issues of sufficiency of the evidence. *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.).

{¶25} An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, paragraph two of the syllabus (1991).

{¶26} The term "manifest weight of the evidence" relates to persuasion. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. It concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), superseded by constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 102 n.4 (1997); *State v. Martin*, 2022-Ohio-4175, ¶ 26.

{¶27} In determining whether a judgment is against the manifest weight of the evidence, an appellate court reviews the entire record, "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Sitting as the "thirteenth juror," the court of appeals considers whether the

evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion. *Id.*

{¶28} When conducting a manifest weight review, the question is whether the jury clearly lost its way in resolving conflicts, resulting in a manifest miscarriage of justice, even if the evidence is legally sufficient. *Thompkins*, 78 Ohio St.3d at 387; *State v. Issa*, 93 Ohio St.3d 49, 67 (2001). Appellate courts have traditionally presumed the jury's assessment is correct, given its ability to observe witnesses' demeanor, gestures, and tone, all critical factors in evaluating credibility. *Eastley*, 2012-Ohio-2179, at ¶ 21; *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶29} A manifest-weight claim succeeds only in "the exceptional case in which the evidence weighs heavily against the conviction." (Internal quotations omitted.) *Thompkins*, 78 Ohio St.3d at 387. To reverse a conviction on manifest-weight grounds, all three judges on the appellate panel must concur. Ohio Const., Art. IV, § 3(B)(3); *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶¶ 2-4, citing *Thompkins*, syllabus ¶ 4.

*Sexual Battery*

{¶30} Appellant contends his conviction for sexual battery, in violation of R.C. 2907.03(A)(1) was based upon insufficient evidence as the State failed to prove he "knowingly coerced" the Victim to engage in fellatio. The trial court acquitted Appellant of sexual battery, in violation of R.C. 2907.03(A)(1). Appellant was convicted of sexual battery, in violation of R.C. 2907.03(A)(3), which provides:

(A) No person shall engage in sexual activity with another; cause another, not the spouse of the offender, to engage in sexual activity with the

offender; or cause two or more other persons to engage in sexual activity when any of the following apply:

* * *

(3) The offender knows that the other person, or one of the other persons, submits because the other person is unaware that the act is being committed.

**{¶31}** For purposes of R.C. 2907.03(A)(3), " '[s]exual activity' means sexual conduct or sexual contact, or both." R.C. 2907.01(C). As relevant herein, "sexual conduct" includes "fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so." R.C. 2907.01(A).

**{¶32}** Unlike R.C. 2907.03(A)(1), "knowingly coerces" is not an element of R.C. 2907.03(A)(3). The State was required to prove Appellant knew the Victim was submitting because she was unaware the act was being committed.

**{¶33}** R.C. 2901.22(B) defines the culpable mental state of knowingly as follows:

A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

**{¶34}** "[T]he focus of R.C. 2907.03(A)(3) is not on the victim's subjective state of mind, but rather 'on what "[t]he offender knows" concerning the victim's submission' due to unawareness." *State v. McCary*, 2019-Ohio-4596, ¶ 32 (2d Dist.), citing *State v.*

*Antoline*, 2003-Ohio-1130, ¶ 52 (9th Dist.). "[I]n many prosecutions under R.C. 2907.03(A)(3), * * * the offender's knowledge that the victim submits because of his or her unawareness is inferred from the victim's testimony that, initially, he or she was subjectively in a state of unawareness (e.g., sleep or unconsciousness), during which the offender initiated and engaged in sexual conduct." (Citations omitted.) *Id*. at ¶ 55.

**{¶35}** Viewing the evidence in a light most favorable to the State, we find any rational trier of fact could have found the State proved the essential elements of sexual battery beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d at paragraph two of the syllabus. The testimony established the Victim had taken her prescription sleeping pill, inserted her retainer into her mouth, and told Appellant she was going to bed. The Victim indicated once her sleeping pill "kicks in," she does not "know what's going on." Trial Tr. at p. 19. The Victim was in bed and had just started to fall asleep when she awoke to the bed moving and Appellant standing over her. Appellant leaned over the Victim, grabbed her neck, and forced his penis into her mouth.

**{¶36}** The Victim's testimony she was just falling asleep when Appellant forced her to perform oral sex on him supports the inference Appellant knew the Victim was submitting because of her unawareness. "[S]leep constitutes a mental or physical condition that substantially impairs a person from resisting or consenting to sexual conduct." *State v. Bivens*, 2019-Ohio-2551, ¶ 43 (5th Dist.), citing *State v. Jones*, 2012-Ohio-5737, ¶ 30 (8th Dist.), citing *State v. Clark*, 2008-Ohio-3358, ¶ 21 (8th Dist.); *State v. Brown*, 2017-Ohio-1114, ¶ 46 (5th Dist.).

**{¶37}** Appellant also asserts his conviction for sexual battery was against the manifest weight of the evidence because the Victim's testimony was inconsistent and contrary to other evidence presented at trial. In support of his assertion, Appellant points

to the Victim's admitted grogginess and inability to remember what happens once she takes a sleeping pill. Appellant submits the trial court recognized the Victim's testimony was not credible as the trial court acquitted him of Count 2, sexual battery, in violation of R.C. 2907.03(A)(1). Appellant continues, because both counts of sexual battery were based solely on the Victim's testimony, his conviction on Count 1, sexual battery, in violation of R.C. 2907.03(A)(3), was necessarily against the manifest weight of the evidence.

{¶38} Upon review of the evidence as set forth in our Statement of the Case and Facts, supra, as well as the entire record in this matter, we find Appellant's conviction on Count 1, sexual battery, in violation of R.C. 2907.03(A)(3), was not against the manifest weight of the evidence. The Victim and Appellant had been arguing after dinner. The Victim told Appellant she was going to bed. She took a prescription sleeping pill, which she acknowledged knocks her out and, "once it kicks in, [she doesn't] know what going on." Tr. at p. 19. As she was falling asleep, she awoke to the bed moving. Appellant was leaning over her and forcing his penis into her mouth. The Victim's lack of wakefulness substantially impaired her from resisting or consenting to the sexual conduct.

{¶39} While announcing its decision, the trial court set forth its reasons for arriving at different findings as to the two counts of sexual battery. As to Count 1, sexual battery involving oral sex, the trial court found the Victim's testimony she could not breathe when Appellant forced his penis into her mouth as she had her retainer in her mouth during the "blow job" to be credible. As to Count 2, sexual battery involving anal sex, the trial court stated, "I think it may have happened. Do I believe it beyond a reasonable doubt? I got some concerns." Tr. at p. 200. Specifically, the trial court considered the lack of DNA or other concrete evidence to establish anal sex occurred.

{¶40} The trier of fact, in this case the trial court, was vested with the authority to weigh the evidence and assess the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, paragraph one of the syllabus (1967). The trier of fact was free to accept or reject any or all of the evidence offered by the parties and assess the witnesses' credibility. Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. McGregor*, 2016-Ohio-3082, ¶ 10 (5th Dist.). The trial court clearly found the Victim more credible than Appellant regarding the events underlying the sexual battery involving oral sex.

{¶41} We find Appellant's conviction for sexual battery, in violation of R.C. 2907.03(A)(3), was based upon sufficient evidence and was not against the manifest weight of the evidence.

*Strangulation*

{¶42} Appellant was convicted of strangulation, in violation of R.C. 2903.18(B)(2), which provides:

> (B) No person shall knowingly do any of the following:
>
> * * *
>
> (2) Create a substantial risk of serious physical harm to another by means of strangulation or suffocation.

{¶43} R.C. 2901.01(A)(5) defines "serious physical harm," as any of the following:

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶44} "'Substantial risk' means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8).

{¶45} Appellant maintains the State failed to present any evidence he created a substantial risk of serious physical harm to the Victim by means of strangulation or suffocation. Specifically, Appellant asserts, although the Victim testified she could not breathe during Appellant's alleged attempt to force her to perform fellatio because her retainer was in her mouth, there was no evidence such created a substantial risk of serious physical harm to her. Appellant further contends the Victim's medical records did not reveal any acute traumatic findings. We find the record belies Appellant's contention.

{¶46} The Victim testified, after Appellant engaged in anal sex, he left the bedroom and she went to the bathroom to clean up. When she exited the bathroom, Appellant was standing in the hallway in front of the bedroom door. Appellant would not let the Victim get past him to return to the bedroom. Appellant grabbed the Victim by the

neck with both of his hands and pushed her against the wall. The Victim fell. She was "so scared" as she thought Appellant was going to kill her. Tr. at p. 25. The Victim explained she suffers from preexisting injuries to her neck and spine and Appellant "could have really done some damage to [her] neck." *Id*. at p. 26. Appellant thrust the Victim against the wall with such force she lost a fingernail. Deputy Halstead observed a "little bit of a red mark" on the Victim's collar bone area. *Id*. at p. 122. Deputy Halstead photographed the Victim's injuries.

**{¶47}** Nurse Shaffer observed external injuries on the Victim, including flushed cheeks and an easily observable reddened area to her anterior neck. *Id*. at p. 144. Nurse Shaffer recalled the Victim's voice was "raspy" and "hoarse," which is common with strangulation. *Id*. The Victim complained of pain in her head and shoulders which persisted into the next day. Scans were taken of the Victim's neck. While the scans did not reveal any internal injury, the medical records noted the Victim was experiencing "pain upon touching her clavicle joint area with crepitus" and "some redness to the skin." *Id*. at pp. 143-144, 148. The medical records also indicated a "right sternoclavicular fracture [was] suspected," but the Victim was informed doctors were unable to determine whether there was a fracture due to the presence of inflammation from her preexisting neck spurs. The Victim was instructed to wear a splint for six weeks and she was referred to a specialist for a follow-up.

**{¶48}** Viewing the evidence in a light most favorable to the State, we find any rational trier of fact could have found the State proved the essential elements of strangulation beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d at paragraph two of the syllabus. In addition, the trial court weighed the evidence and assessed the credibility of the witnesses. The trial court found the medical records and the emergency

care documentation to be persuasive. The trial court noted the photographs of the Victim's injuries and her broken fingernail substantiated her claims. The trial court also found the testimony of the Victim and Nurse Schaffer to be more credible than the testimony of Appellant.

{¶49} We find Appellant's conviction for strangulation was based upon sufficient evidence and was not against the manifest weight of the evidence.

*Domestic Violence*

{¶50} At the outset of his first assignment of error in his Brief to this Court, Appellant contends his "convictions must be reversed and vacated because the State failed to present sufficient evidence to establish beyond a reasonable doubt that Appellant was guilty of Sexual Battery, Strangulation, and *Domestic Violence*." (Emphasis added.) Brief of Appellant at p. 20. Appellant did not develop any argument in support of his contention his conviction for domestic violence was based upon insufficient evidence nor did he cite to any error in the record.

{¶51} Pursuant to App.R. 16(A)(7), an appellant "shall include in its brief * * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies. The argument may be preceded by a summary."

{¶52} Appellate courts are not required to scour the record to develop arguments on a party's behalf. *State v. Roman-Navarre*, 2025-Ohio-3156, ¶90 (5th Dist.). Accordingly, we decline to address this portion of Appellant's first assignment of error as he failed to comply with App.R. 16(A)(7). See, App.R. 12(A)(2).

{¶53} Based upon the foregoing, Appellant's first and second assignments of error are overruled.

{¶54} The judgment of the Stark County Court of Common Pleas is affirmed.

{¶55} Costs assessed to Appellant.


By: Hoffman, J.

King, P.J. and

Montgomery, J. concur.